IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Sean Schmied,                                  :
               Petitioner                 :
                                               :
        v.                                   :
                                               :
City of Philadelphia (Workers'                 :
Compensation Appeal Board),                    :  No. 844 C.D. 2024
               Respondent                 :  Submitted:  May 6, 2025


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                                    FILED:  June 25, 2025


Sean Schmied (Claimant) petitions this Court for review of the Workers' Compensation (WC) Appeal Board's (Board) May 30, 2024 order affirming the portion of the WC Judge's (WCJ) decision that denied Claimant's petition for reinstatement of WC benefits (Reinstatement Petition) and reversing the portion of the WCJ's decision that granted Claimant's petition for penalties (Penalty Petition).  Claimant presents three issues for this Court's review: (1) whether the WCJ erred by denying his Reinstatement Petition; (2) whether the Board erred by denying his Penalty Petition; and (3) whether the Board and WCJ erred by departing from the WC Act's (Act)[1] humanitarian purpose.  After review, this Court affirms.

The City of Philadelphia (Employer) employed Claimant as a police officer.  In early February 2020, Claimant began experiencing COVID-19 symptoms, but continued to work.  He took off work on April 22, 2020, and was

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

hospitalized from April 23 to April 24, 2020. Claimant used his sick time for the days he was off work. Claimant returned to work in a light-duty capacity from February 5 until November 3, 2021, when his light-duty work ended. Beginning November 4, 2021, Employer designated Claimant's time off as E-Time or excused time, and Claimant received full pay without depleting his sick or vacation time. On January 5, 2022, Employer notified Claimant that he would receive 60 days (from the date of the notice) of additional full salary pursuant to the COVID-19 Enforcement Officer Disability Benefits Act (Act 17)[2] and, thereafter, he would have to use sick and vacation time if he remained out of work. On January 14, 2022, Employer issued a Notice of Compensation Denial (NCD) denying liability for Claimant's alleged April 15, 2020 injury to his lungs due to exposure to COVID-19. Claimant returned to full-duty work without restrictions on March 8, 2022.

On March 2, 2022, Claimant filed the Reinstatement and Penalty Petitions (collectively, Petitions), alleging therein that Employer violated the Act by unilaterally stopping WC benefits pursuant to the January 14, 2022 notice, after accepting a WC claim for COVID-19 by paying wages in lieu of compensation. The WCJ held hearings on March 21 and October 13, 2022. Therein, Claimant presented his testimony and his Daily Activity Report (DAR).

Claimant testified that he is a 37-year-old Philadelphia Police Officer (Officer), and that he has been an Officer for 11 years. *See* WCJ Dec. Finding of Fact (FOF) 2(a). The Philadelphia Police Department (Police Department) assigned him to the 39th Police District in April 2020, which is located at 22nd and Hunting

---

[2] Act of April 29, 2020, P.L. 118, No. 17, 35 Pa.C.S. §§ 57A01-02. Act 17 provides that a person who is eligible for Heart and Lung Act, Act of June 28, 1935, P.L. 477, *as amended*, 53 P.S. §§ 637-638, benefits who is temporarily incapacitated from performing his or her duties following a COVID-19 diagnosis may receive up to 60 days of Heart and Lung Act benefits.

Park.  *See id.*  Claimant had routine interactions with other Officers and the general public, all of whom were unmasked.  *See id.*  He related that he was living with his parents in April 2020, when he contracted COVID-19, and that he first experienced symptoms in February 2020, but he continued to work.  *See* FOF 2(b).  Ultimately, the symptoms worsened to the point that he had to stop working on April 22, 2020. *See id.*  He stated that he was hospitalized the next day with severe shortness of breath and coughing, and blood clots in his lungs.  *See id.*

Claimant further described that he notified his supervisor, Sergeant Jamecia Pierce (Sgt. Pierce), of his breathing problems and that he thought he had contracted COVID-19 at work.  *See* FOF 2(c).  He recounted that he had been out of work from April 15 to April 21, 2020, because of respiratory problems prior to notifying Sgt. Pierce and going to the hospital.  *See id.*  Claimant called Sgt. Pierce as he was being wheeled to the intensive care unit after having a commuted tomography scan.  *See id.*

Claimant reported that he was out of work because of respiratory problems from April 23, 2020 to February 4, 2021, when he returned to restricted/light-duty work.  *See* FOF 2(d).  He used his sick time to get paid from April 23, 2020 to February 4, 2021, when he returned to light-duty work in the 39th District's administrative office.  *See id.*  His light-duty assignment ended on November 3, 2021, when Employer put him on E-Time status because of COVID-19.  *See id.*  He stated that Employer paid him his full pay, labeled E-Time, from November 2021 through January 5, 2022.[3]  *See id.*

Claimant described that Employer sent him a letter in January 2022, advising him that E-Time had ended and that he would receive 60 days of additional

---

[3] Although Claimant testified that his E-Time ended on January 5, 2022, *see* Reproduced Record (R.R.) at 179a, the DAR shows that his last E-Time entry was January 13, 2022.  *See* R.R. at 237a.

full salary pursuant to Act 17. *See* FOF 2(e). Claimant was cleared to return to full-duty work on March 8, 2022. *See id.* He related that he continues to work full duty, but still experiences lingering respiratory difficulty for which he receives medical treatment. *See id.*

Finally, Claimant recounted that he is familiar with Employer's WC and Injured On Duty (IOD) system. *See* FOF 2(i). He reported that Employer never offered him any of that paperwork and he believed that anyone out of work because of COVID-19 was exclusively carried as E-Time. *See id.* The DAR confirmed Claimant used his sick and vacation time from April 15, 2020 through February 4, 2021, and he was placed on E-Time on November 4, 2021 through January 13, 2022. *See* FOF 3.

Employer presented its Deputy Finance Director for Risk Management and Risk Manager since 2003, Barry Scott's (Scott), August 15, 2022 deposition testimony, and the Police Department's Infection Control Officer since 2007, Lieutenant Donald Lowenthal's (Lowenthal), August 25, 2022 deposition testimony.

Scott testified that he administers Employer's disability program, including the work-related injury and illness benefits, and PMA Management Corp. (PMA) is the third-party administrator (TPA) that manages the claims and makes decisions regarding the compensability of an employee's injury. *See* FOF 4. Specifically, Scott administers several different programs: WC, Act 17, Heart and Lung Act,[4] and Philadelphia Civil Service Regulation 32 (Regulation 32).[5] *See* FOF 4(a).

---

[4] The Heart and Lung Act provides public safety officers with their full salary while they recover from temporary, work-related ailments.

[5] Regulation 32 is the mechanism by which Employer fulfills its Heart and Lung Act obligations.

Scott described that an Officer asserting a work injury fills out an Employer Accident, Injury, Illness Form (COPA II), after which the Police Department and supervisor investigate, and then the TPA is responsible for handling the claim. *See* FOF 4(b). He stated that, in March 2020, when COVID-19 became an issue, risk management and other departments addressed how to protect Employer's workers from contracting COVID-19, as well as ways to minimize the spread as it impacted Employer's operations. *See* FOF 4(c). Employer issued some policy statements and instituted a timekeeping tool entitled E-Time that enabled an employee to continue to receive his salary when he could not work. *See id.* An employee on E-Time would receive his regular pay, and the time he spent on E-Time would not deplete his accrued time bank. *See* FOF 4(d). This was Employer's mechanism to pay employees without adversely impacting them. *See id.* It was an administrative continuation of wages for whatever reason Employer desired to provide it. *See id.*

Scott related that in April 2020, the General Assembly enacted Act 17, an amendment to the Heart and Lung Act, that provided a compulsory sick leave benefit for up to 60 days for Officers. *See* FOF 4(e). It was constructed to assist Officers who might have contracted COVID-19. *See id.* In January 2022, Scott's office became aware that there were Officers out on E-Time for extended periods, none of whom had completed COPA IIs. *See* FOF 4(f). Thereafter, Employer stopped E-Time, and provided the Officers up to 60 days of benefits in accordance with Act 17. *See id.* After 60 days, Employer required the Officers to use their accrued sick time if they remained out of work. *See id.* It was at that time that Employer received WC petitions from Officers seeking disability benefits related to COVID-19. *See id.*

Scott recounted that Employer developed policies to address the COVID-19 pandemic (Pandemic). *See* FOF 4(g). Each department had a Pandemic

5

coordinator to provide information about the Pandemic. *See id.* The Police Department provided instructions for supervisors regarding COVID-19. *See id.* Scott believed that the Police Department had documents referring to police COVID-19 cases. *See id.* A number of Officers were diagnosed with COVID-19, had COVID-19 symptoms, or were quarantined. *See id.* Employer paid some compensable claims for COVID-19 where the date of loss was in 2020 or 2021; specifically, Employer acknowledged as work-related, COVID-19 cases for Officers who died from COVID-19. *See id.* There might have been other cases, but Scott was not sure. *See id.*

Scott reported that PMA issued NCDs for several Officers in early 2022. *See* FOF 4(i). He believed PMA contacted the Officers to ask them if they believed they had a work-related exposure, and they all denied having work-related exposures that had resulted in COVID-19. *See id.* Scott related that there may have been more investigation than simply inquiring whether the employee advised they contracted it at work. *See id.* Generally, the adjuster handling the file would conduct the investigation. *See id.* Scott stated that it is possible that Employer did not issue any Notices of Compensation Payable (NCP) for work-related COVID-19. *See id.*

Lowenthal testified that he joined the Police Department in 1990. *See* FOF 5(a). He related that as an Infection Control Officer he coordinates the testing of Officers who had bodily fluid exposure. *See id.* Although he handled both bodily fluid exposures and COVID-19 cases before the Police Department set the policy, at some point thereafter, his role was limited to handling only COVID-19 cases. *See id.*; *see also* FOF 5(b). He related that he would direct people how to get tests, how to look for symptoms, what the symptoms were, and explain different terms, such as isolation versus quarantine, etc. *See id.* Eventually, the Police Department began to issue written policies, although Lowenthal had no role in creating them. *See id.* He stated that he would interpret the policies as questions arose, and that he had no role

6

in drafting the questionnaire presented to an Officer diagnosed with COVID-19. *See id.* The guidelines were general in nature, and they were the same for Officers alleging they contracted COVID-19 at work as those who did not make such claims. *See id.*

Lowenthal identified the several iterations of Police Department COVID-19 guidelines that followed. *See id.* He recounted that members of the Police Department and civilian staff would call him and that he used the current policy to provide direction to Police Department employees. *See id.* He further confirmed that the designation for Officers out of work because of COVID-19 was E-Time regardless of whether the infection was work-related. *See id.* He stated that he never conducted any investigation to determine whether a COVID-19 diagnosis was work-related. *See id.* He was not, however, restricted from completing IOD paperwork if a COVID-19 diagnosis was found to be work-related; he simply never investigated that issue. *See id.*

Lowenthal described that he had no idea why the General Assembly added the Act 17 language, and he had no role in adding language that, for the first time, required a supervisor to fill out a COPA II when an Officer alleged he or she contracted COVID-19 at work. *See* FOF 5(c). He related that he did nothing more than answer questions based on the policy in existence when the questions arose. *See id.* He did not compile the list of Officers diagnosed with COVID-19 produced by the Police Department. *See id.* Lowenthal agreed that the first and only time Employer instructed a Police Department supervisor to complete a COPA II for an Officer alleging that he or she contracted COVID-19 at work was in the last version of the policies published in July 2022. *See* FOF 5(d).

On April 17, 2023, the WCJ denied Claimant's Reinstatement Petition, concluding that Claimant failed to meet his burden of proof. Specifically, the WCJ noted that the principal issue centered on whether Employer's issuance of E-Time

payments to Claimant constituted wages in lieu of compensation, which would have the same legal effect as if Employer had formally complied with the Act and accepted the WC claim. Based on the credited testimony of the defense witnesses,[6] the WCJ concluded that Employer did not intend the payments made under its E-Time payroll designation to be payments made in lieu of WC benefits. The WCJ granted Claimant's Penalty Petition and awarded a $5,000.00 penalty, reasoning that Claimant timely notified Employer that he thought he had contracted COVID-19 at work, and that Employer's issuance of the NCD was not timely. Claimant and Employer appealed to the Board. On May 30, 2024, the Board affirmed the WCJ's denial of Claimant's Reinstatement Petition and reversed the WCJ's grant of the Penalty Petition and the penalty award. Claimant appealed to this Court.[7]

Claimant first argues that the WCJ erred by denying his Reinstatement Petition. Specifically, Claimant contends that the WCJ erred by failing to apply pertinent legal authority and competent evidence when considering the purpose and intent of Employer's payments to Claimant after timely work injury notice. Claimant cites *Mosgo v. Workers' Compensation Appeal Board (Tri-Area Beverage,*

---

[6]      [A] WCJ is required to make credibility and evidentiary determinations, to make findings as to the facts underlying the matter, and to determine whether a claimant has met the burden of proving entitlement to compensation, and with regard to these findings and determinations, "the WCJ is the ultimate finder of fact and the exclusive arbiter of credibility and evidentiary weight." *Thompson v. Workers' Comp. Appeal Bd. (USF&G Co.)*, . . . 781 A.2d 1146, 1150 ([Pa.] 2001).

*City of Phila. v. Healey*, 297 A.3d 872, 880 (Pa. Cmwlth. 2023) (quoting *Dep't of Corr. - SCI Chester v. Faison (Workers' Comp. Appeal Bd.)*, 266 A.3d 714, 730 (Pa. Cmwlth. 2021)).

[7] "Our review is limited to determining whether the WCJ's findings of fact were supported by substantial evidence, whether an error of law was committed or whether constitutional rights were violated." *Appel v. GWC Warranty Corp.*, 291 A.3d 927, 930 n.4 (Pa. Cmwlth. 2023) (quoting *DiLaqua v. City of Phila. Fire Dep't (Workers' Comp. Appeal Bd.)*, 268 A.3d 1, 4 n.5 (Pa. Cmwlth. 2021)).

8

*Inc.)*, 480 A.2d 1285 (Pa. Cmwlth. 1984), *Kelly v. Workers' Compensation Appeal Board (DePalma Roofing)*, 669 A.2d 1023 (Pa. Cmwlth. 1995), and *Findlay Township v. Workers' Compensation Appeal Board (Phillis)*, 996 A.2d 1111 (Pa. Cmwlth. 2010), to support his position.  Employer rejoins that the facts of *Mosgo* and *Kelly* are distinguishable from the facts now before this Court.

In *Mosgo*, an employee suffered chest pains after performing arduous duties involving the delivery of 170-pound beer barrels.  Employer relieved him of his duties, and he reported to his physician, who, in turn, sent him to the hospital where he was treated for a heart attack.  The employer's insurer did not file a Notice of Temporary Compensation Payable (NTCP) or an NCD, but, rather, paid Mosgo lost wages for less than two months while it made inquiries regarding whether the heart attack was related to Mosgo's employment.[8]  The employer discontinued the payments after it completed its investigation.  The insurer "took none of the statutory steps required in order to discontinue compensation payments, such as a petition for termination . . . ." *Mosgo*, 480 A.2d at 1286.

Mosgo filed a petition to review notice of compensation, seeking an order directing the insurer to recommence payments.  The insurer responded by asserting that it only made the payments pending the outcome of its investigation.  Mosgo contended that the insurer, having accepted liability by making payments under the Act, may not discontinue payments, and excuse its failure to seek termination on the basis of its noncompliance with the procedures mandated in

---

[8] *Mosgo* pre-dates the 1993 amendments to Section 406.1 of the Act, added by Section 3 of the Act of February 8 1972, P.L. 25, 77 P.S. § 717.1, which added subsection (d), thereby including within the Act for the first time a provision for the issuance of an NTCP where liability is uncertain.

9

Section 406.1 of the Act.[9]  The *Mosgo* Court phrased the question before it as follows:

> [W]hether a [WCJ] in such a case may require the [c]laimant to assume the burden of proof for the continuation of benefits when a proper [NCP] would have put the burden to terminate payments upon the [e]mployer or its insurer.  To allow such a shift of the burden of proof, of course, is to reward those employers and carriers who do not comply with the Act while disadvantaging those who do, not only as to the critical matter of burden of proof, but as to the grant or denial of a supersedeas, an issue which has been held to have constitutional implications.  [*See*] *Baksalary v. Smith*, 579 F.Supp. 218 (E.D. Pa. 1984).

*Id*. at 1288.  The *Mosgo* Court concluded that the insurer's failure to comply with the Act, specifically the failure to comply with Section 406.1 of the Act, estopped the insurer from disavowing its acceptance of liability for Mosgo's injury.  Under such circumstances, the burden would be upon an insurer or employer to comply with the proper procedures for terminating compensation payments - a proceeding in which the insurer or employer would bear the burden of proof regarding a claimant's return to non-disability status.  *See id*.

---

[9] Section 406.1(a) of the Act provides, in relevant part:

> The employer and insurer shall promptly investigate each injury reported or known to the employer and shall proceed promptly to commence the payment of compensation due either pursuant to an agreement upon the compensation payable or a[n NCP] . . . or pursuant to a[n NTCP] . . . on forms prescribed by the [D]epartment [of Labor and Industry] and furnished by the insurer.

77 P.S. § 717.1(a).

In *Kelly*, the claimant worked varied hours as a roofing supervisor and union steward for the employer, often from 6:00 a.m. to 8:00 p.m. or later, including Saturdays. His duties included overseeing other employees and collecting cash from customers in the company truck, which the claimant had use of and drove to and from work on a regular basis. During the night of July 15, 1989, the claimant was brutally assaulted by an unknown assailant and suffered serious injury to his brain and head. The next afternoon, the employer's owner (Owner) visited the claimant in the hospital. Owner stated that he felt responsible for the attack and that he believed another employee was the claimant's assailant. For the next six months, Owner paid the claimant's mortgage of over $500.00. He also gave the claimant's wife $300.00 per week for an unspecified period of time.

On September 24, 1991, the claimant filed two claim petitions for benefits pursuant to the Act. In the relevant petition, the claimant alleged that he was disabled due to severe work-related head injuries stemming from the July 15, 1989 assault. The employer challenged both of the claimant's petitions on the grounds that the claimant's injuries did not occur in the course of his employment. The WCJ concluded that the claimant had suffered a compensable injury, which had occurred within the course and scope of his employment. The WCJ also concluded, *inter alia*, that the employer was estopped by Sections 406.1 and 407 of the Act[10]

[10] 77 P.S. § 731. Section 407 of the Act mandates, in pertinent part:

> On or after the seventh day after any injury shall have occurred, the employer or insurer and employe or his dependents may agree upon the compensation payable to the employe or his dependents under th[e A]ct; but any agreement made prior to the seventh day after the injury shall have occurred, or permitting a commutation of payments contrary to the provisions of th[e A]ct, or varying the amount to be paid or the period during which compensation shall be payable as provided in th[e A]ct, shall be wholly null and void. It shall be

11

from disavowing the compensability of the claim because the cash payments the employer made to the claimant and his wife were wages in lieu of WC indemnity benefits. Lastly, the WCJ concluded that the employer's contest was reasonable. The claimant appealed to this Court.

The *Kelly* Court explained:

> [T]he WCJ found that [S]ections 406.1 and 407 [of the Act] estopped [the e]mployer from disavowing the compensability of [the c]laimant's claim. Viewed in light of *Mosgo*, [the e]mployer's cash payments to [the c]laimant and subsequent failure to file a[n NCD] was an admission of liability which bound [the e]mployer as if [the e]mployer had filed a[n NCP]. Once the WCJ found that liability had been admitted, [the e]mployer's contest could not be reasonable because there was nothing left to resolve. Therefore, the WCJ erred in concluding that [the e]mployer's contest was reasonable and ordering that [the c]laimant's attorney's fees be deducted from his award.

*Kelly*, 669 A.2d at 1026-27.

Finally, in *Phillis*, Inservco Insurance Services, Inc. (Inservco), the TPA for Findlay Township's (Township) WC carrier, petitioned this Court for review of the Board's adjudication. The Board affirmed the WCJ's decision reinstating the claimant's total disability compensation and assessing a penalty against Inservco for violating the Act. The WCJ determined that because Inservco made certain payments to the Township during the time the claimant's WC benefits were suspended, Inservco admitted liability for the claimant's disability compensation. Concluding that the facts, as found, did not support this conclusion, this Court reversed that part of the Board's adjudication.

unlawful for any employer to accept a receipt showing the payment of compensation when in fact no such payment has been made.

77 P.S. § 731.

The *Phillis* Court explicated, in relevant part:

[T]he Board, like the WCJ, did not consider the critical legal element, which was Inservco's *intent* in making those payments. All of the evidence shows that Inservco's intent in sending checks to the Township in 2004 was *not* to compensate [the c]laimant for a work-related injury. [Karl] Vogle[, Inservco's senior claims examiner responsible for the claimant's WC claim] and [the Township's Police Chief, Paul Wilks], both confirmed that Inservco issued the checks in the course of a dispute between Inservco and the Township that did not involve [the c]laimant directly. This is why Inservco issued two separate [NCDs] once it concluded that [the c]laimant's psychological issues were not work-related.

In short, the record lacks substantial evidence to support a finding that Inservco admitted liability for compensation benefits beyond July 8, 2003. On the contrary, the record is devoid of any evidence to support a finding that Inservco ever intended to pay benefits to [the c]laimant after he left work on March 26, 2004. Thus, the Board erred in affirming the reinstatement of [the c]laimant's [WC] benefits.

*Phillis*, 996 A.2d at 1118.

Here, unlike in *Mosgo* and *Kelly*, Employer's E-Time payments to Claimant were not an admission of liability. Scott testified:

Q. . . . . Can you first tell the [WCJ] what E[-T]ime historically has been?

A. **E[-T]ime**, **or excused time**, **is a timekeeping tool that -- which enables an employee to continue to receive their salary when they can't or they're not at work for whatever reason**.

Q. What is the rate of pay for a day of E[-T]time? Is it reduced, regular?

A. **To my knowledge**, **it is their regular pay**.

Q. To your knowledge, does it count as a day of work? Meaning that it's not a leave or something that stops the

13

accrued benefits that any given employee [working for Employer] will accrue while working?

**A. Yes. It doesn't deplete the employee's personal leave time, and they continue to receive their salary, continue to accrue benefits. As a tool, it is a way to let the people get paid and not sort of adversely impact it by being in that E[-T]ime status.**

Q. From Risk Management's perspective *was* payment of E[-*T*]*ime* meant to be construed as *an acknowledgment that the* [] [*O*]*fficer contracted COVID*[-*19*] *at work*?

**A.** *No.*

Q. What was it meant to signify?

**A. It was meant to signify that [Employer] was not trying to punish these [O]fficers and that it was so that they were not losing anything by being in this status, that this was, you know, a situation which we were not expecting, but we were looking to have a situation where, you know, folks who succumbed to this condition were not - weren't financially penalized by the condition.**

Reproduced Record (R.R.) at 5a (italic emphasis added).

Similarly, Lowenthal recounted:

Q. So in your role discussing with these supervisors[,] how would you advise a supervisor to carry a person out for C[OVID-19] on DAR?

**A.** I **would utilize the current policy at the time to provide them with direction.**

Q. And what would be the designation for a person out with C[OVID-19]?

**A. It would be E[-Time], administrative time.**

Q. *Was that true irrespective of whether* or not *it was a work-related exposure* that led to C[OVID-19]?

**A.** *Yes.*

14

Q. From your role as infection - sorry, let me strike that. From your role as infection control officer, did you conduct investigations when you learned that a new [P]olice [O]fficer was out for C[OVID-19] regarding how they were exposed?

**A**. **No**.

R.R. at 30a (italic emphasis added).

As this Court explained in *Bolds v. City of Philadelphia*, 333 A.3d 765 (Pa. Cmwlth. 2025), here,

> Employer disputed that it ever made payments in lieu of compensation or accepted liability for Claimant's alleged work injury. Crediting Scott's and Lowenthal's testimony, the WCJ found that E-Time was intended to respond to the emerging [P]andemic in 2020 without regard to whether the disability was work[-]related. That testimony established that Employer's objective was to pay all employees out of work due to COVID-19, regardless of cause, in order to protect other employees and citizens from exposure.

*Id.* at 773; *see also Brown v. City of Phila. (Workers' Comp. Appeal Bd.)*, 330 A.3d 12 (Pa. Cmwlth. 2025); *Stewart v. City of Phila. (Workers' Comp. Appeal Bd.)*, ___ A.3d ___ (Pa. Cmwlth. No. 490 C.D. 2024, filed Apr. 15, 2025). Accordingly, *Mosgo* and *Kelly* are inapposite. Because "the record lacks substantial evidence to support a finding that [Employer] admitted liability for compensation benefits[,]" *Phillis*, 996 A.2d at 1118, the WCJ properly denied Claimant's Reinstatement Petition.

Claimant next argues that the Board erred by denying his Penalty Petition because the WCJ acknowledged that Employer had notice that Claimant asserted his condition was work-related and did not file the NCD until one year and nine months after it received notice or knew of Claimant's alleged injury or date of his claimed disability. Employer rejoins that there is simply nothing in the Act or

15

case law that would permit a WCJ to award a penalty while simultaneously refusing to award benefits. This Court agrees with Employer.

> To meet his burden of proof on his [P]enalty [P]etition, Claimant had to establish that Employer violated the Act or its regulations by ending his E-Time payments. *See Shuster v. Workers' Comp*[.] *Appeal* [*Bd.*] (*[Pa.] Hum*[.] [*Rels.*] *Comm*[*'n*]*)*, 745 A.2d 1282, 1288 (Pa. Cmwlth. 2000). Because Claimant did not prevail on his [R]einstatement [P]etition, he cannot prevail on his claim that Employer violated the Act, as asserted in his [P]enalty [P]etition.

*Bolds*, slip op. at 13-14; *see also Brown*; *Stewart*. Accordingly, the Board properly denied his Penalty Petition.

Finally, Claimant argues that the Board and WCJ erred by departing from the Act's humanitarian purpose.

> With respect to the [Act], [the Pennsylvania Supreme Court] ha[s] recognized that it "is remedial in nature and is intended to benefit workers." *Martin v. Workers' Comp. Appeal Bd. (Emmaus Bakery)*, . . . 652 A.2d 1301, 1303 ([Pa.] 1995). It, thus, "must be liberally construed in order to effectuate its humanitarian objectives." *Id*.

*Schmidt v. Schmidt, Kirifides & Rassias, PC (Workers' Comp. Appeal Bd.)*, 333 A.3d 310, 318 (Pa. 2025). However,

> [h]ere, resolution of this matter does not entail a borderline interpretation of the Act's language or intent. The administrative tribunals determined, and [this Court] ha[s] no basis to disagree, that [Claimant] failed to meet his reinstatement and penalty burdens of proof. As there is no legal underpinning for relief in this matter, the Act's goals have not been violated.

*Stewart*, slip op. at 20.

16

For all of the above reasons, the Board's order is affirmed.

_____
ANNE E. COVEY, Judge

Judge Dumas did not participate in the decision in this matter.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Sean Schmied,                                            :
                          Petitioner                     :
                                                         :
          v.                                             :
                                                         :
City of Philadelphia (Workers'                           :
Compensation Appeal Board),                              :          No. 844 C.D. 2024
                          Respondent                     :

## O R D E R

AND NOW, this 25th day of June, 2025, the Workers' Compensation Appeal Board's May 30, 2024 order is affirmed.

_____
ANNE E. COVEY, Judge